Jun Bi, Esq.
Mingzi Ouyang, Esq. (*pro hac vice* forthcoming)
Valley & Summit Law
1 Park Plaza, Suite 600
Irvine, CA 92614
Tel: (917) 544-8356
Emails:
eric.bi@valleysummmitlaw.com
marjorie.ouyang@valleysummitlaw.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIANGXI KMAX INDUSTRIAL CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>ZSPACE, INC., PAUL KELLENBERGER, ERICK DEOLIVEIRA, JOSEPH B. POWERS, and DAVID LORIE<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jiangxi Kmax Industrial Co., Ltd. ("Plaintiff" or "Kmax"), a corporation organized under the laws of People's Republic of China ("PRC") with its principal place of business in Jiangxi Province, PRC, brings this action to recover damages, rescission, rescissory damages, and other relief arising from Plaintiff's purchase of securities issued by Defendant zSpace, Inc. (the "Company" or "zSpace"). In connection with zSpace's two pre-initial-public-offering transactions, Plaintiff entered into agreements with zSpace and paid substantial consideration to acquire zSpace securities. This action arises from Defendants' offer and sale of zSpace securities to Plaintiff through materially false and misleading statements, omissions of material fact, the sale of securities in transactions that were purportedly exempt from registration but were not lawfully exempt, and Defendants' subsequent concealment of the true nature, quantity, issuance status, and value of the securities Plaintiff paid to acquire.

Plaintiff brings these claims against zSpace and certain of its current and former senior officers, Paul Kellenberger, Erick DeOliveira, Joseph B. Powers, and David Lorie (each individually a "Defendant" and collectively with zSpace "Defendants"), for violations of the federal securities laws, including the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), and applicable New York law.

Plaintiff alleges the following based upon personal knowledge as to its own acts and transactions and upon information and belief as to all other matters. Such information and belief are based, among other things, upon Plaintiff's review of the agreements governing its investment in zSpace, communications between Plaintiff and Defendants, transfer-agent materials, and other documents and information obtained during Plaintiff's investigation. Plaintiff believes that substantial additional evidentiary support for the allegations set forth herein will be revealed through discovery.

## NATURE OF THE ACTION

1. This is a securities fraud action arising from Defendants' fraudulent scheme to solicit and obtain Plaintiff's investment in zSpace through materially false and misleading statements, omissions of material fact, and deceptive conduct in connection with the purchase and sale of zSpace securities. Over a period of years, Defendants induced Plaintiff to invest $15,000,000 in zSpace's private offerings of securities, while misrepresenting and concealing material facts concerning such securities, the ownership interest Plaintiff would receive, and the effect of subsequent corporate actions on that ownership interest.

2. After securing Plaintiff's investment, Defendants failed to honor their obligations to Plaintiff and failed to deliver the securities and ownership interest for which Plaintiff had paid. Instead, Defendants engaged in a series of undisclosed and wrongful acts that stripped Plaintiff of the value and benefit of its bargain, including diluting Plaintiff's ownership through recapitalizations and purported reverse stock splits that were never

properly disclosed to Plaintiff in the manner required by law or equity and were contrary to Defendants' prior representations and the governing investment documents.

3. When Plaintiff later sought to confirm the zSpace securities it had purchased and the ownership interest to which it was entitled, Defendants did not provide a truthful accounting. Rather, Defendants falsely claimed that Plaintiff's holdings of zSpace securities had been reduced to a tiny fraction of what Plaintiff had purchased and, upon information and belief, attempted to pressure Plaintiff into accepting and ratifying that fabricated position. In doing so, Defendants sought to manufacture a false post hoc account of Plaintiff's investment of zSpace securities in order to justify Plaintiff's drastically diminished ownership position and deprive Plaintiff on the benefit of its bargain.

4. Defendant zSpace is an American technology company that develops and markets virtual and augmented reality platforms and educational products for STEM (Science, Technology, Engineering, and Mathematics), Career and Technical Education ("CTE"), and career-readiness programs.

5. From July 2017 through May 2019, Defendants, directly and indirectly, through their agents, raised $15,000,000 from Plaintiff by marketing and selling zSpace securities to Plaintiff through materially false and misleading statements and omissions. Among other things, Defendants misrepresented or concealed the nature and amount of the securities Plaintiff was acquiring, failed to disclose facts necessary to make their statements not misleading, and later advanced false explanations for Plaintiff's drastically diminished ownership position, including purported reverse stock splits that do not reconcile with the governing transaction documents and Defendants' own prior representations.

6. Defendants and their agents made these misrepresentations and omissions through, among other means, written agreements, offering and transaction documents, e-mails,

telephone calls, and other direct communications with Plaintiff in connection with Plaintiff's investment in zSpace.

7. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has suffered substantial pecuniary damages.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, because this action arises under the Securities Act and the Exchange Act.

9. This Court also has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's federal claims.

10. Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District and because Defendants used the means and instrumentalities of interstate commerce in connection with the acts, transactions, and conduct alleged herein.

11. This action directly concerns the offer and sale of securities to Plaintiff in transactions that Defendants structured and documented as exempt securities offerings under the federal securities laws, and Defendants' subsequent misrepresentations and omissions concerning the issuance, status, ownership, and transferability of those securities.

12. Defendants' transactions with Plaintiff were expressly structured as securities transactions subject to, and purportedly exempted under, the federal securities laws. Defendants sold Plaintiff unregistered securities while invoking federal concepts including

exemption from registration, accredited-investor status, restricted securities status, and limitations on resale under federal law.

13. Defendants' fraudulent scheme, including the offer and sale of securities, misrepresentations concerning share issuance and ownership, concealment of capitalization records, and post-initial public offering misstatements concerning Plaintiff's ownership position, was carried out and concealed through these New York-based instrumentalities. Plaintiff's claims arise directly out of Defendants' conduct directed at and connected to this District. Accordingly, venue and personal jurisdiction are proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14. Defendants purposefully directed securities-related conduct toward this District, including by filing registration statements and other documents with the Securities and Exchange Commission ("SEC"), listing zSpace securities on Nasdaq, and utilizing banking, clearing, and securities-processing systems operating in or through this District in connection with the securities at issue. Plaintiff's claims arise out of and relate to that conduct.

15. Separately, zSpace's Underwriting Agreement (the "Underwriting. Agreement"), executed in connection with its December 4, 2024 initial public offering ("IPO") and filed with the SEC as Exhibit 1.1 attached to zSpace's registration statement, confirms that zSpace purposefully availed itself of New York-based securities markets and contemplated litigation in New York federal court arising from its securities-related conduct. *See* Exhibit A.

16. A true and correct copy of the Underwriting Agreement is attached to this Complaint as Exhibit A ("Ex. A").

17. Although Plaintiff's claims are not brought pursuant to the Underwriting Agreement, zSpace's express submission to the jurisdiction of this Court in connection with

its securities-related conduct further confirms the foreseeability and reasonableness of litigating in this District.

18. Personal jurisdiction over Defendants is proper in this District because, among other things, Defendants transacted business in and directed tortious and securities-related conduct toward this District, and the claims asserted herein arise from or relate to those contacts. In addition, the federal securities law provides for nationwide service of process.

## PLAINTIFF'S DISCOVERY OF DEFENDANTS'SECURITIES FRAUD

19. Plaintiff did not discover, and could not reasonably have discovered, the facts constituting Defendants' fraudulent conduct until late 2024 and early 2025, when, following zSpace's IPO, Defendants for the first time produced information and records reflecting that Plaintiff had never received the securities and ownership position that Defendants had represented Plaintiff had purchased.

20. Before that late 2024 and early 2025, Defendants concealed the true facts concerning Plaintiff's investment and ownership position by, among other things, withholding capitalization tables, recapitalization records, transfer-agent records, financial statements, and other information necessary to determine the securities Plaintiff had purchased and the effect of Defendants' subsequent corporate actions on Plaintiff's ownership interest.

21. As a result of Defendants' concealment and Plaintiff's inability, despite reasonable diligence, to discover the facts demonstrating Defendants' fraud earlier, Plaintiff's claims are timely under the applicable statutes of limitations and repose to the fullest extent permitted by law.

## PARTIES

22. Plaintiff Jiangxi Kmax Industrial Co. Ltd. is the purchaser of zSpace securities in this action.

23. Defendant zSpace Inc. is a corporation organized under the laws of the State of Delaware, with a registered office located at 160 Greentree Drive, Suite 101, Dover, Kent County, Delaware 19904.

24. Defendant Paul Kellenberger ("Kellenberger") is, and at all relevant times was, zSpace's Chief Executive Officer ("CEO") and President.

25. Defendant Erick DeOliveira ("DeOliveira") is, and at certain relevant times was, zSpace's Chief Financial Officer ("CFO").

26. Defendant Joseph S. Powers ("Powers") was, at certain relevant times, zSpace's CFO and Secretary.

27. Defendant David Lorie ("Lorie") is, and at all relevant times was, zSpace's General Counsel.

28. Defendants Kellenberger, Deoliveira, Powers, and Lorie (collectively, the "Individual Defendants"), by virtue of their positions, authority, access to internal information, and participation in the acts and transactions alleged herein, knew or recklessly disregarded that zSpace misrepresented material facts concerning zSpace's pre-IPO securities offerings to Plaintiff, the zSpace securities Plaintiff purchased, whether and to what extent these securities were issued or delivered, and the effect of subsequent purported reverse stock splits and other corporate actions on Plaintiff's ownership position.

## SUBSTANTIAL ALLEGATIONS
## DEFENDANTS FAILED TO DELIVER PLAINTIFF'S PURCHASED ZSPACE SECURITIES AND MISREPRESENTED PLAINTIFF'S OWNERSHIP INTEREST

### A. The Series E Transaction

29. On June 30, 2017, zSpace's Board of Directors approved a Series E financing ("Series E Transaction") pursuant to which zSpace would offer and issue up to 22,222,220 shares of newly created Series E Preferred Stock at a purchase price of $0.90 per share, and

further authorized zSpace to enter into and perform its obligations under the Series E Transaction documents. *See* Exhibit B.

30. A true and correct copy of the Action by Unanimous Written Consent of the Board of Directors of zSpace, Inc. dated June 30, 2017 is attached hereto as Exhibit B ("Ex. B").

31. On or about July 7, 2017, Plaintiff executed zSpace's Series E Preferred Stock Purchase Agreement (the "Series E Purchase Agreement") as an investor in zSpace's pre-IPO Series E financing. *See* Exhibit C.

32. A true and correct copy of the Series E Purchase Agreement dated July 7, 2017 is attached hereto as Exhibit C ("Ex. C").

33. Section 1.1(c) of the Series E Purchase Agreement provides that zSpace would sell and issue shares of the Series E Preferred Stock to certain investors at a purchase price of $0.90 per share, with the purchase, sale, and issuance of such shares to occur at one or more closings. *See* Ex. C, at 1.

34. On September 26, 2017, Plaintiff wired $5,000,000 to zSpace's designated bank account in connection with its investment in the Series E Transaction, and zSpace provided its incoming wire transfer confirmation to Plaintiff. *See* Exhibit D.

35. A true and correct copy of zSpace's wire transfer confirmation with the amount shown as $5,000,000 is attached hereto as Exhibit D ("Ex. D").

36. Based on the Series E Purchase Agreement's stated purchase price of $0.90 per share, Plaintiff's $5,000,000 payment corresponded to approximately 5,555,555 Series E shares, subject only to ministerial rounding and zSpace's obligation to issue and record the purchased securities in accordance with the governing transaction documents. *See* Ex. C.

37. The Series E Purchase Agreement expressly references federal securities laws and the Company's reliance on an exemption from registration for the Company's Series E Transaction.

38. Section 2.2(c)(i) ("Valid Issuance") of the Series E Purchase Agreement defines the "Act" as the Securities Act of 1933, as amended. *Id*. at 3.

39. Section 5.5 of the Series E Purchase Agreement provides that:

> "5.5 <u>Securities Exemptions</u>. ***The offer and sale of the Purchased Shares to the Investors pursuant to this Agreement shall be exempt from the registration requirements of the [Securities] Act***, the qualifications requirements of federal and California Law and the registration and/or qualification requirements of all other applicable state securities laws."
>
> *Id*. at 17 (emphasis added).

40. Section 5.4 of the Series E Purchase Agreement further represents that all permits, approvals, and authorizations required in connection with the "lawful issuance and sale of the securities" had been obtained or would be obtained prior to issuance. *Id*.

41. Furthermore, Section 3.7 ("Restrict Securities") of the Series E Purchase Agreement provides that "[i]n this connection, such Investor represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the [Securities] Act." *Id*. at 13.

42. These representations were material to investors because the Series E Transaction involved the sale of zSpace securities that were not registered under the Securities Act and therefore depended on compliance with applicable federal securities-law exemptions.

43. In connection with the Series E Transaction, Plaintiff and zSpace also entered into an Amended and Restated Investors Rights Agreement dated July 7, 2017 (the "2017 Investors' Rights Agreement").

44. A true and correct copy of the 2017 Investors' Rights Agreement dated July 7, 2017 is attached hereto as Exhibit E ("Ex. E").

45. Section 1.1(o) of the 2017 Investors' Rights Agreement defines a Significant Holder as:

> "***an Investor holding at least 3,000,000 shares of Registrable Securities (subject to adjustment for any stock splits, stock dividends, recapitalizations and the like)***."

Ex. E, at 3 (Emphasis added).

46. As Plaintiff's $5,000,000 Series E investment corresponded to approximately 5,555,555 shares at the contractual price of $0.90 per share, Plaintiff qualified as a Significant Holder within the meaning of Section 1.1(o) of the 2017 Investors' Rights Agreement.

47. Section 2.1 of the 2017 Investors' Rights Agreement set forth zSpace's obligation to deliver to each Significant Holder, among other things, annual audited financial statements, quarterly unaudited financial statements, monthly unaudited financial statements, annual operating plans and budgets, and such other information relating to the Company's financial condition, business, prospects, or corporate affairs as reasonably requested:

> "2.1 Delivery of Financial Statements. The Company shall deliver to each Significant Holder:
>
> (a) as soon as practicable following approval thereof by the Board of Directors, but in any event within ninety (90) days after the end of each fiscal year of the Company, an income statement for such fiscal year, a balance sheet of the Company and statement of stockholder's equity as of the end of such year, and a statement of cash flows for such year, such year-end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles ("***GAAP***"), and audited and certified by independent public accountants of nationally recognized standing selected by the Company;
>
> (b) as soon as practicable following approval thereof by the Board of Directors, but in any event within forty-five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, an unaudited income statement, statement of cash flows for such fiscal quarter and an unaudited balance sheet as of the end of such fiscal quarter;
>
> (c) as soon as practicable following approval thereof by the Board of Directors, but in any event within thirty (30) days of the end of each month, an unaudited income statement, statement of cash flows for such fiscal quarter and an unaudited balance sheet as of the end of such month;
>
> (d) subject to such terms with regard to confidentiality as the Company may reasonably request, any such other information relating to the financial condition,

> business, prospects or corporate affairs of the Company as such Investor or any permitted assignee of such Investor may from time to time reasonably request for such Significant Holder's use solely to monitor his, her or its investment in the Company; provided, however, that the Company shall not be obligated under this Section 2.1 to provide information that it deems in good faith to be a trade secret or similar confidential information;
>
> (e) as soon as practicable following approval thereof by the Board of Directors, and in any event no later than thirty (30) days after the close of each fiscal year of the Company, an annual operating plan and budget, prepared on a monthly basis, for the next immediate fiscal year. The Company shall also furnish to such Significant Holder, within a reasonable time of its preparation, amendments to the annual budget, if any; and
>
> (f) as soon as practicable following approval thereof by the Board of Directors, the Company shall notify the Significant Holders of the engagement of any new independent public accountants to audit the Company's year-end financial reports."
>
> These obligations shall terminate upon a Qualified Public Offering. Each holder of Registrable Securities agrees to hold all information received pursuant to this Section 2.1 in confidence, and not to use or disclose any of such information to any third party (other than its affiliates), except to the extent such information may be made publicly available by the Company. Significant Holders with a commercial business relationship with the Company shall take reasonable measures to ensure that financial information of the Company is segregated from persons engaged in or having responsibility for commercial relations with the Company, and the Company shall have the right to exclude certain sensitive confidential business information, which the Company determines, in its discretion, is confidential or sensitive, from disclosure to such persons if the steps taken are not satisfactory to the Company.
>
> Ex. E, at 14-15.

48. In addition, Section 2.1 of the 2017 Investors' Rights Agreement provides that those obligations terminate upon a Qualified Public Offering. Furthermore, Section 1.1(i) of the 2017 Investors' Rights Agreement defines "Qualified Public Offering" as:

> "the first underwritten public offering of securities of the Company pursuant to an effective registration statement under the Act [Securities Act of 1933] (other than a registration statement relating to either to the sale of securities to employees of the Company pursuant to a stock option, stock purchase or similar plan or an SEC Rule 145 transaction) in which gross proceeds to the Company are at least $50,000,000."
>
> *See Id*. at 2.

49. zSpace and Individual Defendants never delivered to Plaintiff the financial statements and other information required by Section 2.1 of the 2017 Investors' Rights Agreement while those obligations remained in effect. *See Id*.

50. The structure of the Series E Transaction further confirms that this price-per-share calculation, resulting in Plaintiff's total purchased Series E shares of approximately 5,555,555, was consistent with the Series E Purchase Agreement. For example, Schedule A to the Series E Purchase Agreement reflected that another investor in the Series E Transactions, GII zSpace Ltd., was allocated 1,666,666 shares for a total purchase price of $1,499,999.40, which corresponds to the same $0.90-per-share purchase price set forth in the Series E Purchase Agreement. Ex. C, at 27.

51. In addition, zSpace's Restated Certificate of Incorporation dated July 6, 2017 fixed the Original Series E Issue Price at $0.90 per share. *See* Exhibit F.

52. A true and correct copy of the Restated Certificate of Incorporation of zSpace Inc. dated July 6, 2017 is attached hereto as Exhibit F ("Ex. F").

53. Despite Plaintiff's execution of the Series E transaction documents and payment of the full Series E purchase price, Defendants failed to issue, deliver, or accurately account for the Series E securities and ownership interest Plaintiff purchased, later failed to provide records sufficient to explain that discrepancy, and continuously failed to provide Plaintiff the required financial statements.

**B. The Series F Transaction**

54. On May 3, 2019, zSpace's stockholders approved a Series F financing (the "Series F Transaction") by written consent, pursuant to which zSpace agreed to offer and sell up to 24,500,000 shares of newly created Preferred Stock at a purchase price of $1.2261 per share. *See* Exhibit G. That written consent approved, among other things, zSpace's Series F

financing, the issuance of Series F Preferred Stock in the financing, and the adoption of zSpace's Restated Certificate of Incorporation. *Id*.

55. A true and correct copy of the Action by Written Consent of the Stockholders of zSpace, Inc. dated May 3, 2019 is attached hereto as Exhibit G ("Ex. G").

56. In or about May 2019, Plaintiff executed the Series F Preferred Stock Purchase Agreement (the "Series F Purchase Agreement") as an investor in zSpace's pre-IPO Series F Transaction. *See* Ex. H. Under the Schedule of Investors in the Series F Purchase Agreement, Plaintiff agreed to purchase 8,155,941 shares of zSpace's securities in the Series F Transaction for a purchase price of $9,999,999.27. Ex. H, at 23.

57. A true and correct copy of the Series F Purchase Agreement dated May 2019 is attached hereto as Exhibit H ("Ex. H").

58. The Series F Purchase Agreement further provides that zSpace would sell and issue Series F shares of zSpace securities to investors at a purchase price of $1.2261 per share, and that the purchase, sale, and issuance of such shares would occur at an initial closing and one or more additional closings. *See* Ex. H.

59. The Series F Purchase Agreement likewise expressly references federal securities laws. In specific, section 3.5 ("Accredited Investor") of the Series F Purchase Agreement provides that "***[s]uch Investor is an 'accredited investor' within the meaning of SEC Rule 501 of Regulation D, as presently in effect***." *Id*. at 12 (emphasis added).

60. Section 3.7 of the Series F Purchase Agreement states, in the relevant part:

> "***such Investor represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the [Securities] Act***."

*Id*. at 13 (emphasis added).

61. The Series F Purchase Agreement also provides that certificates evidencing Plaintiff's zSpace securities may bear a legend stating that such securities "HAVE NOT BEEN REGISTERD UNDER **THE SECURITIES ACT OF 1933**, AS AMENDED," and "MAY

NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQURIED OR UNLESS SOLD OR TRANSFERRED PURSUANT TO **RULE 144 OF SUCH ACT**." *Id*. at 14 (Emphasis added).

62. These provisions in the Series F Purchase Agreement were material because they confirm that the Series F Transaction involved the offer and sale of unregistered securities in a transaction expressly structured around compliance with federal securities laws, including Regulation D, Rule 144, and the Securities Act's registration requirements and exemptions.

63. On May 8, 2019, Plaintiff wired $10,000,000 to zSpace's designated account in connection with its Series F investment. *See* Exhibit I.

64. A true and correct copy of Plaintiff's original wire confirmation dated May 8, 2019 and a verified translation are attached hereto as Exhibit I ("Ex. I").

65. In connection with the Series F Transaction, Plaintiff and zSpace also entered into an Amended and Restated Investors Rights Agreement dated May, 2019 (the "2019 Investors' Rights Agreement"). *See* Exhibit J.

66. A true and correct copy of the 2017 Investors' Rights Agreement is attached hereto as Exhibit J ("Ex. J").

67. Section 1.1(o) of the 2019 Investors' Rights Agreement defines a Significant Holder as:

> "***an Investor holding at least 3,000,000 shares of Registrable Securities (subject to adjustment for any stock splits, stock dividends, recapitalizations and the like)***."

Ex. J, at 4 (Emphasis added).

68. As Plaintiff's purchased 8,155,941 shares of zSpace securities in the Series F Transaction alone, Plaintiff qualified as a Significant Holder within the meaning of Section 1.1(o) of the 2017 Investors' Rights Agreement.

69. Section 2.1, under Section 2 (Covenants of the Company), of the 2019 Investors' Rights Agreement set forth zSpace's obligation to deliver to each Significant Holder, among other things, annual audited financial statements, quarterly unaudited financial statements, monthly unaudited financial statements, annual operating plans and budgets, and such other information relating to the Company's financial condition, business, prospects, or corporate affairs as reasonably requested:

> "2.1 Delivery of Financial Statements. The Company shall deliver to each Significant Holder:
>
> (a) as soon as practicable following approval thereof by the Board of Directors, but in any event within ninety (90) days after the end of each fiscal year of the Company, an income statement for such fiscal year, a balance sheet of the Company and statement of stockholder's equity as of the end of such year, and a statement of cash flows for such year, such year-end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles ("***GAAP***"), and audited and certified by independent public accountants of nationally recognized standing selected by the Company;
>
> (b) as soon as practicable following approval thereof by the Board of Directors, but in any event within forty-five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, an unaudited income statement, statement of cash flows for such fiscal quarter and an unaudited balance sheet as of the end of such fiscal quarter;
>
> (c) as soon as practicable following approval thereof by the Board of Directors, but in any event within thirty (30) days of the end of each month, an unaudited income statement, statement of cash flows for such fiscal quarter and an unaudited balance sheet as of the end of such month;
>
> (d) subject to such terms with regard to confidentiality as the Company may reasonably request, any such other information relating to the financial condition, business, prospects or corporate affairs of the Company as such Investor or any permitted assignee of such Investor may from time to time reasonably request for such Significant Holder's use solely to monitor his, her or its investment in the Company; provided, however, that the Company shall not be obligated under this Section 2.1 to provide information that it deems in good faith to be a trade secret or similar confidential information;
>
> (e) as soon as practicable following approval thereof by the Board of Directors, and in any event no later than thirty (30) days after the close of each fiscal year of the Company, an annual operating plan and budget, prepared on a monthly basis, for the next immediate fiscal year. The Company shall also furnish to such Significant Holder, within a reasonable time of its preparation, amendments to the annual budget, if any; and

> (f) as soon as practicable following approval thereof by the Board of Directors, the Company shall notify the Significant Holders of the engagement of any new independent public accountants to audit the Company's year-end financial reports."
>
> These obligations shall terminate upon a Qualified Public Offering. Each holder of Registrable Securities agrees to hold all information received pursuant to this Section 2.1 in confidence, and not to use or disclose any of such information to any third party (other than its affiliates), except to the extent such information may be made publicly available by the Company. Significant Holders with a commercial business relationship with the Company shall take reasonable measures to ensure that financial information of the Company is segregated from persons engaged in or having responsibility for commercial relations with the Company, and the Company shall have the right to exclude certain sensitive confidential business information, which the Company determines, in its discretion, is confidential or sensitive, from disclosure to such persons if the steps taken are not satisfactory to the Company.

Ex. J, at 14-15.

70. Section 2.1 of the 2019 Investors' Rights Agreement provides that those obligations terminate upon a Qualified Public Offering. Furthermore, Section 1.1(i) of the 2019 Investors' Rights Agreement defines "Qualified Public Offering" as:

> "the first underwritten public offering of securities of the Company pursuant to an effective registration statement under the Act [Securities Act of 1933] (other than a registration statement relating to either to the sale of securities to employees of the Company pursuant to a stock option, stock purchase or similar plan or an SEC Rule 145 transaction) in which gross proceeds to the Company are at least $50,000,000."

*See Id*. at 2.

71. Furthermore, Section 2.12 of the 2019 Investors' Rights Agreement provides the condition that the termination of certain covenants occurs:

> "The covenants set forth in this Section 2 shall terminate and be of no further force or effect upon (i) the consummation of the Initial public Offering, or (ii) a Liquidation Event (as such term is defined in the Company's Restated Certificate) in which the consideration received is cash or marketable securities."

Ex. J, at 22.

72. zSpace and Individual Defendants never delivered to Plaintiff the financial statements and other information required by Section 2.1 of the 2017 Investors' Rights Agreement while those obligations remained in effect.

73. In addition, in or about May 2019, zSpace's Secretary's Certificate certified, among other things, that the Company's then-effective Restated Certificate of Incorporation and the Board and stockholder consents relating to the Series F Transaction were true and correct remained in full force and effect. *See* Exhibit K.

74. A true and correct copy of the Secretary's Certificate dated May 2019 is attached hereto as Exhibit K ("Ex. K").

75. Defendant Powers was the signatory of the Certificate of the Secretary of zSpace, Inc., in his capacity of Secretary of zSpace. Ex. K, at 2. Defendant Kellenberger was the signatory of zSpace's Restated Certificate of Incorporation dated May 2019, in his capacity as President of zSpace. *Id*. at 4.

76. Despite Plaintiff's execution of the Series F Transaction documents and payment of the full Series F purchase price, Defendants failed to issue, deliver, or accurately account for the Series F securities and ownership interest Plaintiff purchased, later failed to provide records sufficient to explain that discrepancy, and continuously failed to provide Plaintiff the required financial statements.

77. In total, Plaintiff paid $15,000,000 in consideration and acquired approximately 13,711,406 shares of zSpace securities in the Series E and Series F Transactions.

**C. Defendants' Misrepresentations Concerning Plaintiff's Ownership and zSpace's Capitalization**

78. During 2019 to 2024, Plaintiff experienced an executive structural change, consequently, Plaintiff had minimum contact with Defendants, and Defendants continuously failed to deliver Plaintiff's purchased securities.

79. On May 14th, 2024, Plaintiff's new management team initiated communications via e-mail (the "Email Communications") with Defendants DeOliveira and Powers concerning the financial statements that zSpace was obligated to provide to Plaintiff, pursuant to Plaintiff's investments of zSpace securities in the Series E and Series F

Transactions. Exhibit L, at 8-9. Plaintiff's May 14, 2024 e-mail was disregarded by DeOliveira and Powers. *Id*.

80. A true copy of the Email Communications between the parties is attached to this Complaint as Exhibit L ("Ex. L").

81. Defendants continuously failed to provide Plaintiff with zSpace's financial statements from May to September of 2024.

82. On September 5, 2024, Plaintiff followed up with Defendants by sending DeOliveira and Powers an e-mail concerning zSpace's undelivered financial statements to Plaintiff. Ex. L, at 8.

83. On September 6, 2024, DeOliveira responded to Plaintiff's September 5, 2024 e-mail and refused to provide Plaintiff with zSpace's financial statements, in the relevant part:

> "At this time, we are able to share publicly-available financials currently filed before the SEC. Our latest S1/A financials include audited 2023 financials, and reviewed Q1 2024 results, and can be found here:
>
> https://www.sec.gov/rchives/edgar/data/1637147/00011046924087855/tm244059-17_s1a.htm"
>
> *Id*. at 7-8.

84. DeOliveira, in his September 6, 2024 e-mail, delivered only a zSpace's publicly filed document with the SEC that Plaintiff has sufficient access. *Id*. DeOliveira's conduct as zSpace's CFO is a refusal to provide Plaintiff zSpace's financial statements and constitutes breaches of Sections 2.1 of the 2017 Investors' Rights Agreement and the 2019 Investors' Rights Agreement. Ex. E, at 14-15; Ex. J, at 14-15.

85. Defendants continuously failed to provide Plaintiff with zSpace's financial statements from September to December of 2024, until Plaintiff became aware of zSpace's IPO on December 4, 2024.

86. On December 4th, 2024, zSpace went through its IPO, raising approximately $9.4 million by offering its common stock at $5.00 per share. zSpace's common stock started trading on Nasdaq with the ticker symbol "ZSPC."

87. On December 30, 2024, after learning about zSpace's IPO on December 4, 2024, Plaintiff inquired DeOliveira via e-mail about the number of zSpace's securities held by Plaintiff as of December 30, 2024, and whether Plaintiff was able to sell its zSpace securities, in the relevant part:

> "Recently we heard the news of zspace's IPO, and as shareholders, we are very glad. Meanwhile, we reviewed the financial information you sent last time, but could not find how many shares held by KMAX. We would like to known the following information with you, if it is not convenient to provide directly, we can also appoint a U.S. law firm to provide relevant letters to you to obtain the information:
> 1. the number of shares held by KMAX as of today, and the corresponding value;
> 2. If we wish to sell our shares, is it possible to do so at any time? Or is there any U.S. stock exchange procedure that we should follow?"

Ex. L, at 7.

88. On December 31, 2024, Kellenberger, zSpace's CEO, replied to Plaintiff's December 30, 2024 e-mail and directed Plaintiff to Dawn Khatami ("Khatami"), an employee of zSpace, who was in charge of connecting Plaintiff to zSpace's external transfer agents regarding Plaintiff's zSpace securities, in the relevant part:

> "CC'ing Dawn here on our team who can connect you to the external transfer agents that manage our company stock as a public company."

*Id.*

89. On January 1, 2025, Khatami responded to Plaintiff in the Email Communications and provided the contact information of zSpace's transfer agent, Odyssey Transfer and Trust Company ("Odyssey"), in the relevant part:

> "Below is the contact information for our transfer Agent, Odyssey Transfer and Trust Company. A 'Welcome' email and statement of equity holdings will be email to each shareholder at the beginning of next week.
> The email address we have on record from the Carta platform is 'sam@richmax.com.cn.' This is where all future correspondence will be sent. If Sam

> is no longer managing the account, please provide an email address for the appropriate person or business alias. For your convenience, we can request the change from our side."

*Id*. at 6-7.

90. On January 3, 2025, Plaintiff followed up with Khatami's January 1, 2025 e-mail and inquired about the whereabouts of the "Welcome email" and "statement of equity" from Odyssey, the "Carta platform" unknown to Plaintiff, and Defendants' awareness of any previous Plaintiff's designated authorizer before Plaintiff's executive structure change, in the relevant part:

> "please send the 'Welcome' email and statement of equity holdings to the following email address: yanzy@kmaxxr.com. Besides, We haven't heard of Carta platform before, this seems to be an asset management platform? Is our stock managed in this platform?
> Also would like to check with you guys if there are any designated authorizers for KMAX before? If so, we would like to change it to me as well."

*Id*. at 6.

91. Plaintiff's January 3, 2025 e-mail was disregarded by Khatami and Defendants.

92. Then on January 16, 2025, after not hearing back from Khatami and Defendants for thirteen days, Plaintiff followed up with Khatami via e-mail:

> "Hi Dawn~ Did you send the "Welcome" email and statement of equity holdings to sam or anyoneelse? I haven't received the email from you yet."

*Id*.

93. On the same day, Khatami responded to Plaintiff's e-mail and represented that he would confirm with Odyssey that the "Welcome" letters were sent to all shareholders and get back to Plaintiff when he had more information. *Id*. at 5.

94. On January 19, 2025, after not hearing back from Khatami and Defendants for more than three days, Plaintiff followed up with Khatami via e-mail and inquired again concerning the whereabouts of the "Welcome" letter. Ex. L, at 5.

95. On January 21, 2025, two days after Plaintiff's follow-up e-mail on January 19, 2025, Khatami responded to Plaintiff's previous questions concerning the whereabouts of the "Welcome" letter and Plaintiff's equity statement, in the relevant part:

> "There was a miscommunication between us and Odyssey. They only send the Welcome letter and statement via physical mail for security and compliance reasons. In our age of technology, when they said 'send,' we assumed that would be email.
>
> The statement The statement and letter have been mailed out. I have now received training on the Odyssey platform and can run that myself for you. Please see the attached. Sam's email address is still listed, but I just sent another request for that to be updated as well. Email addresses are how Odyssey confirms your account, so please wait to contact them until that update has been processed. Today is a federal holiday here in the US, and Odyssey is closed today, but the update should be processed sometime tomorrow afternoon (Jan 21, 2025, Eastern time). I have also included a copy of the Welcome letter with the Odyssey contact information.
>
> As you review the statement I've included, you will notice the *RSTR* ZSPACE-LSH90. This refers to a 90-day restriction on all shares imposed by the SEC at IPO due to Rule 144 and company securities reporting compliance. No trading can occur until after March 6, 2025"
>
> *Id*. at 4-5.

96. Attached to Khatami's January 21, 2025 e-mail was a welcome letter from Odyssey (the "Welcome Letter") and an equity statement of Plaintiff's zSpace common stock (the "Equity Statement"). *Id*.; Exhibit M; Exhibit N.

97. A true and correct copy of the Welcome Letter is attached to this Complaint as Exhibit M ("Ex. M").

98. A true and correct copy of the Equity Statement is attached to this Complaint as Exhibit N ("Ex. N").

99. According to the Equity Statement, as of January 20, 2025, Plaintiff only owns 4,569 shares of zSpace common stock, which is astonishingly short from Plaintiff's purchased total purchased 13,711,406 shares of zSpace securities in the Series E and Series F Transactions. Ex. N. In addition, Plaintiff's owned zSpace common stock as shown in the

Equity Statement only had a total then value of $62,184.09 for $13.61 per share, far short from Plaintiff's paid consideration of $15,000,000 in the Series E and Series F Transactions. *Id*.

100. The Equity Statement is a demonstration of Defendants' perpetration of securities fraud upon Plaintiff. As the Equity Statement illustrates, Plaintiff had two purchases of zSpace securities, the first purchase was on September 26, 2017, representing the Series E Transaction, and the second purchase was on May 9, 2019, representing the Series F Transaction. Ex. N.

101. *First*, the Equity Statement shows that Plaintiff's purchase of zSpace securities in the Series E Transaction was for only 1,851 shares for a price of $67.5306 per share, as opposed to the approximate 5,555,555 shares that Plaintiff purchased for a price of $0.90 per share according to the Series E Purchase Agreement. *Id*.; Ex. C. Furthermore, the Equity Statement shows that Plaintiff's paid consideration for the Series E Transaction was merely $124,999.21, contrary to Plaintiff's paid consideration of $5,000,000 as demonstrated by the Series E Purchase Agreement and the wire transfer confirmation in the Series E Transaction. Ex. N; Ex. C; Ex. D.

102. *Second*, the Equity Statement shows that Plaintiff's purchase of zSpace securities in the Series F Transaction was for only 2,718 shares for a price of $91.9792 per share, as opposed to the 8,155,941 shares that Plaintiff purchased for a price of $1.2261 per share according to the Series F Purchase Agreement. Ex. N; Ex. H. Furthermore, the Equity Statement shows that Plaintiff's paid consideration for the Series F Transaction was merely $249,999.34, contrary to Plaintiff's paid consideration of $10,000,000 as demonstrated by the Series F Purchase Agreement and the wire transfer confirmation in the Series F Transaction. *Id*.; Ex. I.

103. As another discrepancy shown in the Equity Statement, Plaintiff's purchased zSpace securities in both the 2017 Series E Transaction and the 2019 Series F Transaction are

listed as issued on December 4, 2020, which are irreconcilable with the dates of Plaintiff's purchases and only serve as evidence that Defendants failed to issue Plaintiff's purchased securities until long after the Series E and F Transactions, if Plaintiff's purchased zSpace securities were ever issued.

104. zSpace's common stock dropped precipitously after zSpace's IPO on December 4, 2024, as of March 10, 2026, zSpace's common stock closed at $0.22 per share, and Plaintiff's zSpace common stocks as shown on the Equity Statement only had a total value of $1,055.18. As a result, Plaintiff's investments in zSpace securities in the Series E and Series F Transactions suffered a dramatic and disastrous decline from $15,000,000 to merely $1,055.18. Plaintiff's investments of zSpace securities in fact evaporated.

105. On January 20, 2025 (the time stamps of the e-mails in the Email Communications are influenced by the time difference between PRC and the U.S.), as astonished by the discrepancy between Plaintiff's purchased shares of zSpace securities and Plaintiff's then owned shares as shown in the Equity Statement, Plaintiff inquired Defendants Powers and DeOliveira via e-mail concerning that discrepancy and whether there had been any sales of Plaintiff's zSpace securities before Plaintiff's executive structure change, in the relevant part:

> "Hello Joe/Erick,
>
> Firstly, thanks for referring dawn to provide us with the equity statement and sorry for asking about work during ur holiday, you may reply us when you get back to work. ***We've reviewed the equity statement and find that KMAX only holds 4,569 shares, but according to the SERIES F PREFERRED STOCK PURCHASE AGREEMENT signed between KMAX and zSpace in May 2019, KMAX purchased 8,155,941 shares at a price of $9,999,999.27. We understand that the value of per share may change, but the number of shares hold by KMAX should remain the same.***
> Therefore, we would like to find out if there have been any instances of KMAX selling shares during the past few years. We are also looking into the situation internally, but we would also like to ask for support and help from your side, and if necessary, we can hire a US law firm to assist in investigating the situation."
>
> Ex. L, at 4 (emphasis added).

106. On January 21, 2025 (the time stamps of the e-mails in the Email Communications are influenced by the time difference between PRC and the U.S.), DeOliveira responded to Plaintiff's January 20, 2025 e-mail and represented that the discrepancy in Plaintiff's ownership of zSpace securities was caused by zSpace's reverse stock splits pursuant to recapitalizations, in the relevant part:

> "Hello,
>
> Thank you for your email. ***There have been no Kmax sales of zSpace shares, prior to the IPO there was no liquid market for our securities.***
>
> ***Subsequent to Kmax's 2019 investment, there were occasions of reverse share splits pursuant to recapitalizations of the company, and revaluations of the company's enterprise values ("down rounds".)***
>
> Dawn [Khatami] can provide the history of the reverse splits and impact on share counts. This will reassure you that there's nothing amiss to investigate on your end regarding transactions in the stock."
>
> *Id*. at 4.

107. On January 21, 2025 (the time stamps of the e-mails in the Email Communications are influenced by the time difference between PRC and the U.S.), Plaintiff followed up with DeOliveira's previous e-mail and requested clarifications from DeOliveira concerning zSpace's purported recapitalization as the cause for the reduction in Plaintiff's shares of zSpace securities:

> "Just to confirm with you, does 'the company' in this paragraph refer to zSpace: 'Subsequent to Kmax's 2019 investment, there were occasions of reverse share splits pursuant to recapitalizations of the company, and revaluations of the company's enterprise values'
> and the reduction in the number of shares holdl by KMAX is due to the recapitalization of zspace, right?"
>
> *Id*. at 3-4.

108. On the same day, DeOliveira responded to Plaintiff's previous inquiry addressed to him and confirmed that the reduction in Plaintiff's shares of zSpace securities was caused by zSpace's purported recapitalizations:

"Yes, that is correct."

*Id*. at 3.

109. Then on the same day, Plaintiff requested zSpace's documentation relating to the purported zSpace's purported reverse stock splits from Khatami, in the relevant part:

> "Hi Dawn, pls provide us informations and materials relating to the reverse splits and downward adjustment of the number of shares when u back to work, thank you!"

*Id*.

110. On January 22, 2025, Khatami responded to Plaintiff's previous request for documentation concerning zSpace's purported reverse stock splits, in the relevant part:

> "I've attached the information we gave after the December 2020 recapitalization. ***However, in December 2023, we were already on our path to an IPO and were restricted in the financial information we could share; therefore, we did not send any updates to our shareholders.***
> ***I have not received a document similar to the attached for the 2023 financing, but I can tell you that the recapitalization resulted in a 75:1 reverse split.*** Are there specific materials you are looking to receive? ***Our S1 filing, which is now public, does detail the recapitalization.*** I could forward the link if you'd like to review it."

*Id*. (emphasis added).

111. Defendants' representative's response in their January 22, 2025 e-mail about zSpace's restriction delivery of financial information was untrue. Both the 2017 Investors' Rights Agreement and the 2019 Investors' Rights Agreement unequivocally require zSpace to deliver financial statements to Plaintiff until there was a Qualified Public Offering or Initial Public Offering, neither of which occurred until the consummation of zSpace's IPO on December 4, 2024. Ex. E; Ex. J.

112. Even assuming Defendants' representation of zSpace's purported reverse stock split of 75:1 as true, the mathematical calculation of Plaintiff's reduced ownership of shares of zSpace securities does not square. Plaintiff purchased approximately 13,711,406 shares of zSpace securities in the Series E and Series F Transactions, and Plaintiff's reduced shares of

zSpace securities after the purported 75:1 reverse stock split should be approximately 182,819 shares, not 4,569 shares shown in the Equity Statement.

113. Attached to Khatami's January 22, 2025 e-mail was a letter dated April 5, 2021 from Joseph S. Powers, as the former CFO of zSpace, addressed to shareholders of zSpace (the "Powers Letter"). Exhibit O.

114. A true and correct copy of the Powers Letter is attached to this Complaint as Exhibit O ("Ex. O").

115. In the Powers Letter, Powers stated that in December 2020, zSpace completed a financing resulting in committed gross proceeds of $6 million (the "December 2020 Financing"), and a 40-1 reverse stock split with respect to all of zSpace capital stock and convertible securities was a condition of the December 2020 Financing, in the relevant part:

> "***in December 2020, zSpace completed a financing that resulted in committed gross proceeds of $6 million to zSpace, comprising of $3 million in debt and $3 million in equity ("Financing")***. The equity component was issued in the form of Series A Preferred Stock at a per share purchase price of $0.01032602 (post the stock split described below). After considering alternative fundraising options, the Board deemed the Financing to be the best available alternative for zSpace given zSpace's financial situation and need for capital to fund continued operations.
>
> ***In connection with the Financing, and as a condition to its closing, zSpace took action to cause the following to occur:*** (i) all of the shares of the Company's Preferred Stock outstanding prior to the Closing were converted into Common Stock of the Company, (ii) existing warrants to purchase Preferred Stock outstanding prior to the Closing were converted into warrants to purchase Common Stock and (iii) ***the Company effected a 40-1 reverse stock split with respect to all of its capital stock and convertible securities.*** This communication serves as notice of the Preferred Stock conversion and Company stock-split.
>
> Ex. O (emphasis added).

116. After being profoundly astonished and confused by the evaporation of Plaintiff's investment in zSpace securities due to the purported reverse stock splits, Plaintiff consulted with counsel regarding the truthfulness of Defendants' representations.

117. Then on March 20, 2025, Plaintiff inquired Khatami again about the reason why zSpace's purported stock splits had caused Plaintiff's investment of $15,000,000 in

zSpace securities disastrously plummeted to merely a few thousand dollars, in the relevant part:

> "***During the past one month, we've consulted with several U.S. attorneys and all of them told us that stock reverse split will only reduce the share number we hold, but will not reduce the value of our shares.***
> Having carefully considered our long-standing relationship, we do not wish to see it deteriorate, so could you send us the materials and details of the circumstances that led to the reduction in the value of our company's shareholding?
> ***Meanwhile, we found that the welcome letter and equity statement previously sent to us are not valid U.S. shareholder identification documents, can you provide a copy of KMAX's legal identification as an existing zspace shareholder?***
> Lastly, we sincerely hope that both sides will continue to maintain a friendly and cooperative relationship in the future without any misunderstanding or suspicion, and therefore hope that we will be given"
>
> Ex. L. at 2-3 (emphasis added.)

118. On March 24, 2025, Khatami responded to Plaintiff's March 20, 2025 e-mail and refused to provide further details concerning zSpace's purported reverse stock splits, in the relevant part:

> "I can address the administrative portions of your email.
>
> ***I do not have any further details concerning the recapitalizations (reverse splits) or the circumstances that led to these events beyond what has been previously communicated***."
>
> *Id*. at 2 (emphasis added).

119. Khatami's March 24, 2025 e-mail also included the representation that the Equity Statement sent by Odyssey was "informational only," and Defendants sent a physical certificate for the Series E Transaction in 2017 and Series F Transaction in June of 2019, in the relevant part:

> "***The information you received from Odyssey or that I forwarded you is not intended to be "shareholder documents." It is informational only to where Kmax shares of zSpace are "held" until transferred to a brokerage of your choice.*** All "physical certificates" were voided when we transitioned to the Carta platform in July 2018. All certificates were deemed "electronic" and viewable on the platform.
> ***My records do show that you were sent a physical certificate for the Seriers F financing in June of 2019.***
> This was at the request of someone at Kmax so you could "see" these shares. This was not an instrument to be sold, transferred, or used as "proof" of ownership. ***This and the***

> ***Preferred Series E certificate from 2017 that Kmax also had possession of were converted to Common during the equity recapitalization on December 4, 2020, and the Common electronic shares resided on the platform.***"

*Id*. (emphasis added).

120. In fact, Plaintiff was never in possession of any certificates of Plaintiff's owned zSpace securities relating to the Series E and Series F Transactions.

121. Also in Khatami's March 24, 2025 e-mail, Khatami informed Plaintiff that Plaintiff's zSpace securities were restricted shares :

> Other information: The restriction period for all shares ended on March 6. We have been collaborating with Odyssey to lift the restrictions for those who wish to transfer their shares to a broker. ***If you would like us to submit a request to remove the restrictions from the Kmax shares, please confirm the details I included in the attached letter titled "Jiangxi Kmax Rule 144 Non-Affiliate Stockholder Representation Letter." Kindly sign the letter, and our legal counsel will submit the necessary Opinion Letter documentation to remove these restrictions fully.*** After that has been processed, I can put you in contact with our Account managers, who can assist you with transferring the shares.

Ex. L, at 2 (emphasis added).

122. Attached to Khatami's March 24, 2025 e-mail is a letter titled "Jiangxi Kmax Rule 144 Non-Affiliate Stockholder Representation Letter" (the "Representation Letter") that Defendants wanted Plaintiff to sign. *Id*.; Exhibit P.

123. A true and correct copy of the Representation Letter is attached to this Complaint as Exhibit P ("Ex. P").

124. The Representation Letter, purportedly sent from zSpace's legal department in connection with a proposed Rule 144 sale, sought to induce Plaintiff to adopt and affirm false statements regarding the number, acquisition dates, and nature of the zSpace securities Plaintiff purchased. The Representation Letter states, in the relevant part:

> "In connection with your legal opinion regarding my proposed sale of up to **4,569** shares (the "Shares") of common stock (the "Common Stock") of zSpace, Inc. (the "Company"), pursuant to Rule 144 of the Securities Act of 1933, as amended (the "Securities Act"), I hereby represent and warrant to you as follows:

1. **Acquisition of Shares**: I acquired **2718 Shares on May 9, 2019 and 1,851 shares on September 26, 2017** which is more than one year prior to the date of this letter. I acquired the Shares in a private transaction from the Company.

2. **Holding Period**: I have beneficially owned and held the Shares for a period of more than one year, calculated in accordance with Rule 144(d) of the Securities Act.

3. **Restricted Securities**: I understand that the Shares are "restricted securities" as defined in Rule 144(a)(3) of the Securities Act.

4. **Non-Affiliate Status**: I am not now, nor have I been at any time during the preceding three months, an "affiliate" of the Company, as that term is defined in Rule 144(a)(1) of the Securities Act. Specifically, I represent that: o I am not an officer, director, or managing member of the Company.
   o I do not, directly or indirectly, control, or have the power to control, the Company.
   o I am not a 10% or greater shareholder of the Company.
   o I have no agreements, understandings, or arrangements that would cause me to be deemed an affiliate.

4. **No Undisclosed Agreements**: There are no agreements or understandings with any person to act in concert with respect to the sale of the Shares.

5. **Accuracy of Information**: All information provided by me to you in connection with this matter is true, accurate, and complete.

6. **Understanding of Rule 144**: I understand the requirements of Rule 144 and intend to comply with all applicable provisions in connection with the sale of the Shares.

I understand that you are relying on these representations in rendering your legal opinion. I agree to promptly notify you of any changes in the foregoing representations."

Ex. P.

125. The statements in Section 1 of the Representation Letter are false. Plaintiff did not purchase merely 2,718 shares on May 9, 2019 and 1,851 shares on September 26, 2017. Rather, as alleged above and reflected in the governing transaction documents, Plaintiff purchased approximately 5,555,555 shares in the Series E Transaction and 8,155,941 shares in the Series F Transaction, for a total of approximately 13,711,496 shares before any purported later adjustments. Exs. C, H, P. The Representation Letter thus materially understates Plaintiff's purchased shareholdings and misrepresents Plaintiff's acquisition history.

126. Under the document properties view of the Representation Letter on Microsoft Word, Defendant Lorie is shown as the author of the Representation Letter. Exhibit Q.

127. A true and correct copy of a screenshot of the document properties view of the Representation Letter is attached to this Complaint as Exhibit Q ("Ex. Q").

128. By asking Plaintiff to execute or adopt the Representation Letter, Defendants sought to create a false written record that Plaintiff had acquired only 4,569 shares in total, thereby attempting to legitimize Defendants' misrepresentation of Plaintiff's ownership position and facilitate a Rule 144 opinion and sale based on false premises.

129. Upon information and belief, Defendants conducted the Series E and Series F Transactions in reliance on one or more exemptions from registration under the Securities Act, including Regulation D.

130. Rule 503 of Regulation D requires an issuer relying on Regulation D to file a notice of exempt offering on Form D with the SEC no later than 15 calendar days after the first sale of securities in the offering.

131. Upon information and belief, zSpace did not file any Form D or other notice of exempt offering with the SEC in connection with, at minimum, the Series E Transaction. Plaintiff is further informed and believes that it remains unclear whether the Series Transaction, and Plaintiff's Series F investment in particular, was included in any Form D filing.

132. Plaintiff is informed and believes that Defendants failed to comply with one or more conditions necessary to qualify for or maintain any claimed exemption from registration. Among other things, Defendants' apparent failure to make any required Form D filing in connection with, at minimum, the Series E Transaction evidences noncompliance with the federal securities laws governing exempt offerings, although failure to file Form D is not, by itself, a condition to the availability of a Regulation D exemption.

133. Plaintiff is further informed and believes that discovery will reveal whether Defendants failed to comply with other substantive conditions governing any claimed exempt offering, including conditions reflected in the governing transaction documents and applicable federal securities regulations.

134. Defendants did not disclose to Plaintiff the legal basis for any claimed exemption from registration and did not disclose the risks associated with any noncompliance with federal securities laws governing unregistered offerings. In addition, Defendants did not disclose to Plaintiff that no Form D had been filed in connection with, at minimum, the Series E Transaction, or whether any Form D filing encompassed the Series F Transaction and Plaintiff's Series F investment.

135. Defendants have failed to produce documents reflecting the legal basis for the Series E and Series F Transactions, including internal memoranda, legal opinions, compliance analyses, or communications with counsel concerning registration or exemption from registration.

136. Defendants have further failed to produce capitalization tables, stock ledgers, transfer-agent confirmations, or other records that would permit Plaintiff to confirm whether Plaintiff's securities were ever validly issued and outstanding.

137. Defendants' concealment of these materials prevented Plaintiff from discovering earlier the true status of Plaintiff's securities, Defendants' treatment of Plaintiff's ownership interests, and Defendants' noncompliance with applicable securities-law requirements, despite Plaintiff's reasonable diligence.

138. As a direct and proximate result of Defendants' conduct, including their concealment of Plaintiff's true ownership position and their failure to disclose material facts concerning the issuance, status, and treatment of Plaintiff's securities, Plaintiff suffered

substantial injury, including loss of investment value, and loss of ownership rights, and other damages to be proven at trial.

## FIRST CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Against all Defendants)**

139. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

140. In connection with the purchase or sale of securities, and by the use of the means or instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, Defendants, directly or indirectly, knowingly or recklessly: (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon Plaintiff.

141. Defendants' misconduct included, among other things, misrepresenting or omitting material facts concerning: (i) the number and nature of securities Plaintiff would receive in exchange for its investments; (ii) whether Plaintiff's purchased zSpace securities were validly issued, outstanding, and properly recorded on zSpace's books and records; (iii) the effect, timing, and scope of any purported recapitalizations, reverse stock splits, or other corporate actions affecting Plaintiff's holdings; (iv) Defendants' compliance with federal securities laws in connection with the Series E and Series F Transactions; and (v) Plaintiff's actual post-IPO ownership position.

142. Defendants also engaged in a deceptive scheme and course of conduct, including failing to issue or properly account for Plaintiff's purchased securities, concealing capitalization records and transfer records, communicating or coordinating with the

Company's transfer agent in a manner that misstated Plaintiff's ownership, and attempting to induce Plaintiff to accept false ownership positions through later communications and documents, including the Representation Letter.

143. Defendants acted with scienter. Defendants knew, or recklessly disregarded, that Plaintiff's share ownership as later represented to Plaintiff could not be reconciled with Plaintiff's Series E and Series F Purchase Agreements, payment records, and the purported corporate actions advanced by Defendants as explanations.

144. Each Individual Defendant held senior executive, financial, or legal roles within zSpace and approved, participated in, or knowingly disregarded the recapitalizations, disclosures, and communications concerning Plaintiff's investments. Defendants knew that the share counts later delivered to Plaintiff were inconsistent with Plaintiff's purchase agreements and that the purported reverse stock splits and recapitalizations could not mathematically reconcile the discrepancy. Defendants' conduct constitutes conscious misbehavior or recklessness.

145. Plaintiff reasonably relied on Defendants' misrepresentations and omissions in deciding to invest in zSpace securities and in refraining from taking earlier steps to protect its ownership interests. Defendants' misstatements, omissions, and concealment were a substantial factor in Plaintiff's decision-making.

146. Plaintiff's losses were caused by Defendants' fraud. By failing to issue, preserve, and accurately account for Plaintiff's purchased zSpace securities, Defendants prevented Plaintiff from exercising ownership rights, obtaining accurate information concerning its holdings, or exiting its position prior to the IPO-related collapse in value.

147. Plaintiff's damages are not attributable to market forces but to Defendants' misconduct. Plaintiff seeks out-of-pocket damages, rescissory damages, and equitable relief,

including disgorgement, measured by the consideration paid less the value, if any, of zSpace securities Plaintiff actually received.

148. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 20(a)**
**(Against Individual Defendants Kellenberger, DeOliveira, Powers, and Lorie)**

149. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

150. As alleged above, Defendant zSpace violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

151. At all relevant times, Individual Defendants Kellenberger, DeOliveira, Powers, and Lorie were control persons of zSpace for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

152. By reason of their positions as officers, executives, directors, legal counsel, and/or other control persons of zSpace, Defendants Kellenberger, DeOliveira, Powers, and Lorie had the power and authority to control the contents of zSpace's offering documents, capitalization records, investor communications, disclosures, and statements concerning Plaintiff's securities, and they exercised control over the acts and transactions complained of herein.

153. Defendants Kellenberger, DeOliveira, Powers, and Lorie directly or indirectly participated in, approved, directed, and/or knowingly disregarded the conduct constituting zSpace's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], and were culpable participants in the fraud alleged herein.

154. By reason of the foregoing, Defendants Kellenberger, DeOliveira, Powers, and Lorie are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for zSpace's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of the Securities Act Section 12(a)(1)**
**(Against All Defendants)**

155. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

156. Section 5 of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] prohibits the offer or sale of securities unless a registration statement is in effect or an exemption from registration applies.

157. Defendants offered and sold securities to Plaintiff in the Series E and Series F Transactions without a registration statement in effect as to such securities.

158. Upon information and belief, Defendants purported to rely on an exemption from registration, including Regulation D. Plaintiff is informed and believes that Defendants failed to comply with one or more conditions necessary to qualify for or maintain such exemption. Among other things, Defendants failed to make any required Form D filing in connection with, at minimum, the Series E Transaction, which evidences noncompliance with the federal securities laws governing exempt offerings.

159. Plaintiff is further informed and believes that discovery will reveal whether Defendants failed to comply with other substantive conditions reflected in the governing transaction documents and applicable federal securities regulations, including conditions relating to the lawful issuance and sale of the securities and the conduct of the offerings as purportedly exempt transactions.

160. As a result of Defendants' failure to register the offerings or to qualify for a valid exemption from registration, including at minimum with respect to the Series E Transaction, Defendants are liable under Section 12(a)(1) of the Securities Act [15 U.S.C. § 77l(a)(1)].

161. Plaintiff is entitled to rescission of the unlawful transactions or, in the alternative, rescissory damages, together with interest, costs, and such other relief as the Court deems proper.

162. Plaintiff is ready, willing, and able to tender any securities received, if any, in connection with the unlawful offerings upon entry of judgment or as directed by this Court.

**FOURTH CLAIM FOR RELIEF**
**Violations of Section 15 of the Securities Act**
**(Against Individual Defendants Kellenberger, DeOliveira, Powers, and Lorie)**

163. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

164. As alleged above, Defendant zSpace violated Section 12(a)(1) of the Securities Act [15 U.S.C. § 77l(a)(1)].

165. At all relevant times, Individual Defendants Kellenberger, DeOliveira, Powers, and Lorie were control persons of zSpace for purposes of Section 15 of the Securities Act [15 U.S.C. § 77o].

166. By reason of their positions as officers, executives, directors, legal counsel, and/or other control persons of zSpace, Individual Defendants Kellenberger, DeOliveira, Powers, and Lorie had the power and authority to control the contents of zSpace's offering materials, purchase agreements, investor communications, disclosures, capitalization records, and statements concerning Plaintiff's securities.

167. Individual Defendants Kellenberger, DeOliveira, Powers, and Lorie exercised control over the acts and transactions complained of herein and directly or indirectly

participated in, approved, directed, and/or knowingly disregarded the conduct constituting zSpace's violations of Section 12(a)(1) of the Securities Act.

168. By reason of the foregoing, Defendants Kellenberger, DeOliveira, Powers, and Lorie are liable as control persons under Section 15 of the Securities Act [15 U.S.C. § 77o] for zSpace's violations of Section 12(a)(1) of the Securities Act [15 U.S.C. § 77l(a)(1)].

## FIFTH CLAIM FOR RELIEF
**Breach of Contract**
**(Against Defendant zSpace)**

169. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

170. Plaintiff and zSpace entered into valid and enforceable agreements governing Plaintiff's pre-IPO investment, including but not limited to the Series E Purchase Agreement, the Series F Purchase Agreement, the 2017 Investors' Rights Agreement, and the 2019 Investors' Rights Agreement, along with other accompanying agreements (collectively, the "Investment Agreements"). Exs. C, E, H, and J.

171. Plaintiff fully performed all obligations required under the Investment Agreements, including timely payment of the investment funds.

172. zSpace breached the Investment Agreements by, among other things: (1) failing to issue, deliver, and/or properly account for the zSpace securities and ownership interests Plaintiff purchased; (2) failing to honor its conversion, liquidity, information, and/or reporting obligations; (3) failing to maintain accurate capitalization and ownership records reflecting Plaintiff's interests; and/or (4) making representations in the Investment Agreements concerning the lawful issuance and sale of securities, and related rights and obligations, that were false when made.

173. As a direct and proximate result of zSpace's breaches, Plaintiff has suffered damages in an amount to be proven at trial, including rescissory damages, expectancy damages, consequential damages, and other relief available at law or in equity.

174. Plaintiff is entitled to all available remedies for zSpace's breaches, including damages, interest, attorneys' fees to the extent recoverable under the Investment Agreements or applicable law, and equitable relief.

**SIXTH CLAIM FOR RELIEF**
**FRAUD**
**(Against All Defendants)**

175. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

176. In connection with the offer and sale of zSpace securities, and Defendants' subsequent communications concerning Plaintiff's ownership interests, Defendants made materially false statements and omissions of fact, including but not limited to misrepresentations regarding the use of proceeds, the securities and ownership interests Plaintiff would receive in exchange for its investments, whether Plaintiff's purchased securities were validly issued and properly reflected on zSpace's books and records, and the effect of any purported recapitalizations or reverse stock splits on Plaintiff's holdings.

177. Defendants knew these statements were false when made, or acted with reckless disregard for the truth.

178. Defendants intended that Plaintiff rely on these misrepresentations and omissions in deciding to invest and in refraining from taking earlier steps to protect its ownership interests.

179. Plaintiff reasonably relied on Defendants' misrepresentations and omissions in deciding to make the pre-IPO investment.

180. Even after zSpace common stock's dramatic decline, Defendants continued their fraudulent conduct by misrepresenting Plaintiff's ownership position and attempting to induce Plaintiff to accept that it had purchased only a total of 4,569 shares in 2017 and 2019, based on Defendants' purported reverse stock split calculations, rather than the substantially larger number of shares Plaintiff had paid to acquire.

181. Plaintiff suffered damages as a direct and proximate result of Defendants' fraud, including loss of principal, loss of ownership rights, lost opportunity costs, and other out-of-pocket losses.

182. Defendants' conduct was willful, malicious, and in conscious disregard of Plaintiff's rights, entitling Plaintiff to punitive damages where permitted by law.

**SEVENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**Thereunder In the Alternative**
**(Against all Defendants)**

183. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

184. This claim is pleaded in the alternative to Plaintiff's breach of contract claim to the extent any relevant agreement is determined to be unenforceable, inapplicable, or otherwise insufficient to provide complete relief.

185. Plaintiff conferred substantial benefits upon Defendants by providing $15,000,000 in investment funds in connection with the Series E and Series F Transactions.

186. Defendants knowingly received and accepted these benefits.

187. Defendants' retention of these benefits is unjust because the funds were obtained through misrepresentations, unlawful conduct, and Defendants' failure to deliver or properly account for the securities Plaintiff purchased.

188. Equity and good conscience require restitution to Plaintiff of the benefits wrongfully obtained or retained by Defendants.

## EIGHTH CLAIM FOR RELIEF
**CONVERSION**
**Thereunder In the Alternative**
**(Against All Defendants)**

189. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

190. Plaintiff had a possessory and ownership interest in specifically identifiable property, including the securities and ownership interests purchased with Plaintiff's investment funds.

191. Defendants wrongfully exercised dominion and control over Plaintiff's property by failing to issue, deliver, preserve, and accurately account for Plaintiff's purchased securities and ownership rights.

192. Defendants' conduct constituted conversion of Plaintiff's property.

193. As a direct and proximate result of Defendants' conversion, Plaintiff has suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Awarding compensatory damages in favor of Plaintiff against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b) Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(c) Ordering an accounting of Defendants' use of Plaintiff's investment funds and imposing a constructive trust over any improperly obtained proceeds; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 11, 2026

**Valley & Summit Law**

*/s/ Jun Bi*
Jun Bi, Esq.
Mingzi Ouyang, Esq. (*pro hac vice* forthcoming)
1 Park Plaza, Suite 600
Irvine, California 92614
Tel: (917) 544-8356
Emails:
eric.bi@valleysummitlaw.com
marjorie.ouyang@valleysummitlaw.com

*Counsel for Plaintiff*